[Civ. No. 14705.   Second Dist., Div. Three.   July 26, 1945.]

ALFRED J. DIXON, Respondent, v. JOHN MALLOY, Appellant.

George J. Tapper and Louis P. Pink for Appellant.

George W. Burch, Jr., for Respondent.

SHINN, J.—We have in this case an appeal by John Malloy from a judgment in favor of plaintiff Dixon, the latter being the broker who found a purchaser for Malloy's property, accepted deposits from the purchaser, and notified the owner thereof under circumstances stated in *Holway* v. *Malloy, ante,* p. 317 [160 P.2d 893], this day decided. The judgment in the present case awarded plaintiff the sum of $3,000 as damages for defendant's failure and refusal to convey his property to Holway, plaintiff in the other action, upon the terms stated in the written listing which defendant gave to plaintiff herein. The pertinent provisions of the writings involved are stated in our opinion in the other case and we shall not repeat them. When Holway gave two checks for $500 each and was given receipts by Dixon stating the terms of the purchase, he signed a writing on the bottom of each receipt, stating, "I agree to purchase the above described property on the terms and conditions herein stated." Each receipt stated, "purchase price to be $30,000.00 Plus 5%. Five per cent commission

dollars," and it also stated, "commission to be paid out of escrow by buyer." The situation then was that Malloy had listed the two properties with Dixon for sale at a net price of $30,000 cash; Dixon was made exclusive agent for 30 days to find a purchaser and was to receive a 5 per cent commission from Malloy only in case the latter, himself, sold the property within that time. Before the term of the agency expired Dixon procured a purchaser who agreed to pay $31,500 for each property, $1,500 of which was to be paid to the agent and the balance, less the encumbrances, to Malloy. The latter did not sign any agreement to sell the property other than the listing agreement and refused to sell it at all. Upon these facts the court gave judgment for Dixon for the sum of $3,000, and Malloy appeals.

Appellant contends that there was a failure to meet the requirement that an agent, in order to comply with the terms of an authorization to sell, must produce a buyer willing to buy upon the owner's stipulated terms. The rule is sought to be applied here upon the theory that the owner stipulated, in listing the property, for the payment of the entire sum of $30,000 for each property in cash, out of which he would pay the encumbrance of $12,000 on one property and $13,000 on the other, whereas Holway was proposing to pay in cash only the amount of Malloy's equity in each property. In arriving at a proper construction of the listing agreement, we derive little assistance from the cited cases, which involved agreements essentially different from the one before us. The first and principal case relied upon by appellant in support of his construction of the agreement is *Cottingham* v. *Smith* (1938), 28 Cal.App.2d 345 [82 P.2d 479]. The case, in our opinion, is not in point. The owner there had authorized an agent to sell her ranch for $35,000. The agent procured a buyer who was willing to pay $14,000 in cash and to assume a $21,000 mortgage held by the Federal Land Bank. It was held that the offer to purchase did not conform to the terms stated by the owner, in that it appeared that the latter expected to receive the entire purchase price in cash, and to be in a position to pay the encumbrance upon the land. The determinative fact in that case, which was emphasized as the reason for the decision, was that the listing with the agent made no mention of the encumbrance. Here the contrary is true. In the other cases cited by appellant the offers made by the intending pur-

chasers were clearly at variance with the terms specified by the owners in the authorizations given to the agents. The factual situations were in no respect comparable to those of our case. One of defendant's listings stated, "Incumbrance $13,000.00, Interest 5% By Northern Life Insurance Per. Mo. ........ Taxes $500.00." The other listing showed an encumbrance of $12,000 and rate of interest 5 per cent, but did not state the name of the holder. Each listing, under the printed heading of "price," stated, "Net 30,000" and under the printed word "Down" was typed "cash." Then in printing, "Bal. .......... Per Mo. .......... % ........ Yrs." But below these were the statements of the encumbrances. The statement of the price of $30,000 (typed) and the word "net" (handwritten) and the figure "$12,000" (typed) after the word "incumbrance" (printed) and "5%" (typed) below the word "interest" (printed), taken together, could be given but one of two meanings. Either the sum of $30,000 was to be paid in addition to the encumbrance, or the amount of the encumbrance was to be deducted from the price of $30,000. Clearly the latter was the case. If the owner's terms had called for the full sum of $30,000 in cash, out of which he would have to pay the encumbrances, no purpose would have been served by listing the encumbrances and the rates of interest. In order to give the word "cash" the meaning attributed to it by appellant it would be necessary to ignore altogether the specification of the encumbrances. This would violate a fundamental rule of construction which requires that the contract be construed as a whole, so as to give effect to every part, if reasonably practicable. (Civ. Code, § 1641.) Under the circumstances, "cash" meant that there would be no deferred payments to the owner, such as might be evidenced by a second deed of trust. The court interpreted the listing agreements as calling for the payment of $17,000 cash for the property that had a $13,000 encumbrance, and $18,000 for the property that had the $12,000 encumbrance. In arriving at this interpretation the court no doubt took into consideration the following pertinent facts: The answer of Malloy alleged that he signed the agreement upon the condition that Dixon would obtain Mrs. Malloy's consent to a sale of the property upon the terms stated and that Dixon failed to obtain her consent. Upon sufficient evidence this defense was found to be untrue. It was found that Mrs. Malloy had previously executed and delivered to

her husband a deed conveying all of her interest in the properties. It was alleged in the complaint, and admitted in the answer, that Holway deposited $18,000 as the purchase price of one property and $17,000 for the other; these allegations were admitted by the answer but it was not alleged that either sum was less than the price for which the respective properties had been listed. The court heard extensive evidence as to all of the negotiations prior to the listing and of everything that transpired afterward. Malloy stated to Dixon the amount of the encumbrance on each property. Holway testified that he discussed the escrow with Malloy just before it was opened, that the latter asked him how much money he was putting in escrow, that he told Malloy he was depositing the full amount above the encumbrances and that Malloy stated that $5,000 would be enough with which to open the escrow. Malloy did not suggest in this conversation that he expected to receive more than $35,000 in cash. After this conversation he promised to meet Holway and Dixon and go into escrow but failed to do so and dropped out of sight for some three weeks. When Holway later demanded that he go through with the deal, Malloy gave as his sole excuse that Mrs. Malloy would not consent to it. The uncontradicted evidence was that Mrs. Malloy on April 5th, 1943, gave her husband a quitclaim deed to the property in connection with a proposed property settlement agreement, but that it was not recorded and that she had torn it up on the following evening when it was presented to her in order that she might initial some corrections. There was not a word of testimony throughout the extensive trial to the effect that a greater sum than $35,000 in cash was ever mentioned or that Malloy understood that he was to receive any more than that sum on a completed sale. It was in evidence that on April 1, 1943, Dixon presented to Malloy a written offer of one Evanoff to purchase one of the properties for $30,000, $13,000 of which was to be represented by the encumbrance, $8,000 was to be in cash and the balance evidenced by second trust deed payable at the rate of $1,000 per month. Malloy signed an acceptance conditioned upon the payment of $31,000, out of which he would pay Dixon a commission, and upon the further conditions that Mrs. Malloy would sign the deed if it should be required by the title company, and that the second trust deed would constitute an encumbrance on the furniture. He allowed two days for the acceptance of this counter proposition, but it

was not accepted. On April 7, the day the listings in question were made, he stated to Dixon that he did not want the Evanoff deal, did not want to take a second trust deed, but wanted to sell for cash. If a proper construction of the listings would be that Malloy was to receive $60,000 in cash he would have had a complete defense to the present action. He knew the terms of Holway's offer and he at no time made objection to the amount of cash included in that offer. Throughout the trial it was not suggested by counsel for either Mr. or Mrs. Malloy that the listing agreements called for cash payments of more than $35,000.

After a diligent examination of the pleadings, and a reading of the entire transcript, we are forced to the conclusion that the point is made for the first time on the appeal that the listing agreement called for the payment of more than $35,000 in cash. However this may be, we are satisfied that the listing agreements, considered by themselves, or with all of the circumstances surrounding their execution, fully support the construction which the trial court gave to them. It seems entirely clear to us that when an owner of real estate lists his property for sale with a broker, specifying the total price to be paid, and describing encumbrances thereon which are not yet due, and with no stipulation that the encumbrances are to be paid off in case of a sale, he authorizes the agent to find a purchaser who will take the property subject to the encumbrances and pay the difference either in cash or upon terms stipulated in the listing.

The two actions were tried together but the sole defense presented in the present case was that the listing agreements were signed conditionally, as we have stated. There was a vast amount of evidence as to the domestic difficulties of Mr. and Mrs. Malloy and as to the circumstances under which she had executed the deed in favor of her husband. While this evidence was more pertinent to the issues in the specific performance case of *Holway* v. *Holway*, it was to be considered in connection with Malloy's claim that he signed the agreements upon the condition that his wife's signature would be obtained. Although there was testimony given by Mr. Malloy which would have supported a finding that the listing agreement was not to become effective unless Mrs. Malloy signed it, which testimony would have been supported by some of the

circumstances in evidence, it is not contended upon the appeal that the finding in favor of plaintiff upon this issue is not supported by the evidence. And there is evidence to support it; plaintiff testified that he knew of the execution of the quitclaim deed and he denied specifically any discussion or understanding that Mrs. Malloy's signature was to be obtained or that he was to obtain it.

Holway opened an escrow with the Title Insurance and Trust Company May 5, 1944, and deposited in escrow $35,000, which was the difference between the price Malloy was asking for the two properties and the unpaid balance of the encumbrances thereon. Appellant, in endeavoring to show that Holway was not willing to purchase upon the terms of Malloy's listing, points out what he contends are conditions in the terms of Holway's escrow instructions which differed from the terms of the listing. According to the instructions, 1943-44 taxes and prepaid rentals, and interest on the encumbrances, were to be adjusted as of the close of escrow May 15, or as soon as it was possible to close it. The instructions also called for "insurance as handed you" and a bill of sale of the personal property, with inventory to be approved by the buyer. Holway was to pay the "buyer's service fee," cost of recording deed, cost of chattel search, and cost of procuring beneficiary's statements as to the unpaid amounts of the encumbrances. Malloy had stipulated in his written listing of the property with Dixon that he would furnish "satisfactory title." He made no objection to any of the terms of Holway's instructions in the escrow, and it is apparent that he had no intention of going through with the sale upon any terms at the stipulated price of $30,000 for each parcel. The terms of the adjustments through the escrow were favorable to Malloy; Holway was offering to pay a part of the 1943-44 taxes, the second installment of which presumably had been paid by Malloy before delinquency April 20. Demand for adjustment of prepaid rentals and interest on the encumbrances as of the date of delivery of the deed was reasonable and customary and not in conflict with the terms upon which Malloy had listed his property for sale.

The court found that the furniture and furnishings listed for sale were the community property of defendants Malloy, no part thereof being the furniture, furnishings or fittings of the home of the defendants or either of them. It

was also found that the real property had been the community property of defendants Malloy but that Mrs. Malloy had conveyed her interest to her husband April 5, 1943, and that the same thereby became his separate property. The finding as to the community character of the personal property does not affect plaintiff's right to recover damages. It is unnecessary to determine whether the evidence was sufficient to justify the finding that the real property was the separate property of Mr. Malloy. It was not stipulated as one of the terms of the agency agreement that Mr. Malloy's obligation was conditioned upon his wife's consenting to the sale. ■ Even if the property was community property, neither the fact that Mrs. Malloy did not sign the agency agreement nor the fact that she refused to join with her husband in a sale of the property would avail Mr. Malloy as a defense to the action by the broker. His obligation to the broker became fixed when the latter found a purchaser ready, able and willing and who offered to buy the property upon Mr. Malloy's terms. (*Traxler* v. *Katz* (1931), 116 Cal.App. 226, 230 [2 P.2d 553]; *Russell* v. *Ramm* (1927), 200 Cal. 348, 366 [254 P. 532], and cases therein cited.)

■ Upon the facts found, plaintiff was entitled to recover from Mr. Malloy the amount which he would have received as compensation if the sale had been consummated. (*Klepper* v. *American-LaFrance F. E. Co.* (1930), 104 Cal.App. 249 [285 P. 1048]; *Herman* v. *Savage* (1936), 17 Cal.App.2d 238, 243 [61 P.2d 1195].)

Plaintiff performed services as broker which would have enabled him to receive $3,000 as compensation if the sale had been consummated; the failure of Mr. Malloy to consummate the sale resulted in damage to plaintiff in the amount of $3,000. Appellant has presented no sufficient ground for disturbing the judgment.

The judgment is affirmed.

Desmond, P. J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 20, 1945.